Case number 10-1934, Ford Motor Company v. United States of America. Argument not to exceed 15 minutes per side. Mr. Garr, you may proceed for the appellant. Thank you, Chief Judge Batchelder, and may it please the Court, with the Court's permission, I'd like to reserve five minutes for rebuttal time. Your Honors, the Supreme Court's decision in this case calls upon this Court to consider two issues on remand. First, it asks this Court to consider the government's new argument, made for the first time in the Supreme Court, that this Court lacked jurisdiction over this action under 28 U.S.C. 1346. And second, it asks this Court to consider the impact of that... It really isn't whether we have jurisdiction, but whether the district court has jurisdiction. Is that correct? That's right, whether the courts have jurisdiction over this action. And second, the Supreme Court asks this Court to consider what impact that jurisdictional determination has on the merits issues especially, in the Supreme Court's words, on the application of the strict construction rule to Section 6611 of Title 26 of the U.S. Code. On the first issue, the government's argument must be rejected because the government itself acknowledges this Court held in E.W. Scripps v. United States that Section 1346 does supply jurisdiction, and does waive the United States sovereign immunity from suit for overpayment interest actions just like this. That decision was absolutely correct, and it is fully binding on this panel. And once it is acknowledged that Section 1346A supplies the waiver of sovereign immunity and jurisdiction that permits this action to proceed, then it becomes clear that Section 6611 is a separate substantive provision that is not entitled to the rigors of the strict construction rule. In fact, we think that the right way to understand the Supreme Court's decision, and its decision on certiorari in this kind of case was extraordinary, is that the Supreme Court wouldn't have taken that extraordinary action if it did not harbor serious doubt about the application of the strict construction rule. Now, with respect to the jurisdictional issue, this Court held in the Scripps case that 1346A did waive the sovereign immunity, the United States sovereign immunity of suit over overpayment actions like this. There are two clauses in 1346A. One pertains to suits for internal revenue taxes, and the other pertains to the collection of any sum alleged to have been excessive under the internal revenue laws. The Court in Scripps focused on the any sum clause, and we think that the Court was absolutely correct to find that that clause weighs the United States sovereign immunity to suit under the strict construction rule for overpayment, for actions for overpayment interest just like this. The Court in Scripps recognized that any sum, a very broad phrase, which the Supreme Court referred in the Flora case to a catch-all phrase, clearly encompasses interest. In the Flora case, the Supreme Court recognized that interest was a quote, obvious example of a sum, and it recognized that a taxpayer was seeking to collect an excessive sum when it was seeking to collect the full value of its overpayment to the United States Internal Revenue Service. You're arguing right now that Scripps was decided correctly? Yes. That's what you're arguing? Yes. Can I sort of run by you my take on Scripps? Of course, I was on the Scripps panel, but it had been a long time, and I had to do some studying to remember. I'm still not sure I'm remembering accurately what I thought at the time, but Scripps is not explicit about some things that I think must of necessity be implicit in the opinion. Really, I'm thinking of two things. Scripps deals with Shaw by saying, well, in this particular situation, there's no requirement that the word interest be specifically mentioned in 1346, and that's so because we go back to Flora, because we look at the context of the internal revenue laws, we look at other statutes like 6611, and we see that in this particular context, Shaw does not require what it might be read as requiring, and instead here, the word sums is properly read as encompassing interest. Do you agree with that take on it? Well, Your Honor, I think largely. Or is there something wrong with that analysis? I think largely. I mean, the government in Scripps did make the Shaw argument. And the court cites Shaw, but it never quite gets to explaining what it must have done with Shaw in the way I think you have to sort of explain more. Well, it does. No, that's right, Your Honor. It does say that it considered the government's argument, and it does say explicitly that it finds that 1346A is a waiver of sovereign immunity. The court also says that the question before it was quite easy, obvious, and quite clear. This is on page 592 of its decision, which are words consistent with finding that it does meet the strict construction rule. And I think with respect to the specific phrase sum, I think all the court had to do, as it did, was look to the Flora decision where the Supreme Court has recognized that sum is broad enough to include interest. And then the only question left under the clause that the court found jurisdiction under is whether or not the taxpayer is seeking an excessive sum from the IRS where it's seeking the full value of the overpayment it made. Now, in Scripps, the court also emphasized that the purpose of the overpayment interest provision is to ensure that the taxpayer can receive the full value, the lost time value of the money that it paid to the United States, the deposit to the United States in the overpayment of tax. And that's exactly what this case is about. The taxpayer in this case submitted more than $800 million to the United States because the United States had said in a 30-day notice that it believed that it had underpaid its taxes. Those funds were actually used to pay Ford's tax liability. And then it was after that point that the IRS acknowledged that Ford had, in fact, overpaid its taxes and that, therefore, it was entitled to money back because it had made an overpayment. And the only question is, the central merits question in this case, is whether Ford is entitled to the full value of its overpayment back, not only the principle but the interest on that as well. And I think Scripps helps answer that question as well because what the interest provisions are seeking to do is to allow Ford to obtain the lost time value of its money. Now you've moved on to the merits issue. Well, I have, and I'm certainly happy to talk about the jurisdictional issue further. I just want to figure out where you are in your argument. Right, and I think there are really three steps here. One is whether or not the court should abide by its decision in Scripps, and we think it's binding on this panel. Two, whether or not the strict construction rule would apply to the construction of 6611. And on that, I think our position has always been that once you recognize 1346A as the waiver of sovereign immunity for overpayment interest claims, then you have to look at 6611 as a separate, substantive provision. For us to accept that, though, we'd have to rule that our previous decision was incorrect, our previous panel decision. In this case, that's right, Your Honor, but I think the court would take guidance. Trying to figure out how the arguments all fit together. No, that's right. That's because we looked at 6611 as the waiver provision. Right, and in fairness to this court, at that time, the issues weren't as fleshed out about the interplay between jurisdiction under 1346 and the substantive provision of 6611. I think that aspect of the case is in sharper relief today. That's kind of you, but I'm just trying to figure out what it is we'd have to be inconsistent with. Right. The first issue, we'd have to be inconsistent with Scripps to change our position on jurisdiction. And on the second issue, which is whether there's this strict construction applying in this case, we would have to, to rule for you, we would have to rule inconsistently with our previous panel decision. That's right on the second issue. I think on the first question, really, I don't take the court's prior decision as inconsistent with Scripps directly because the court recognized it didn't question its jurisdiction. But I think one would understand the interplay between 13 and 46. Your third argument is just the merits? The third argument is the merits. And I think on that, the most important thing is once the rigors of the strict construction rule are removed, then I think this court's prior panel decision really answers the merits question before this court. I think to find— Although it just suggests that the arguments against you are strained. It doesn't flat out reject them. And I agree with that, Your Honor. We're not suggesting the court has resolved that issue. Can I ask just one question? Because I think, and I may not ask the question with the greatest clarity, so bear with me, all right? I'm trying to figure it out. When I first came upon this case, it seemed kind of strange that you would have one rule of rules, one way of calculating it when you're going one way but not in the other way. It seemed inconsistent with time value of money and so forth. As you explain, it's sort of a bottom line. If you accept that, then you have to use something like the strict construction rule to get over it, which is what we did, all right? But now I'm wondering a little bit whether it does conflict with time value of money and a reasonable reading of the scheme. What if the statute says, let's see, you are in—taxpayer is in disagreement with the government about whether certain tax is owed, and it's going to take some years before it gets finally decided. So you're trying to figure out who has the money during that period, right? It might be three years. In fact, it was more than that in this case, okay? So you've got this time period ahead of you. The taxpayer is thinking, I have two choices given to me by the statute. I cannot pay, and if I lose, I'm going to have to pay interest. Or I can pay, and if I win, I'll get interest, right? And the statute seems to set up both of those. What if you had a statutory scheme where that was the case, but then the government says—or the taxpayer says, in effect, I'm having trouble which one to opt.  I can do one, which is consistent with the time value of money, or I can do the other, which is consistent with the time value of money. I might want to take into account how likely it is I'm going to succeed. I might want to take into account what I would otherwise do with that money. I've got a great investment here, or I don't. I might take into account how much interest I think I'm going to get compared to putting it in a bank. Those are the kinds of things, and those things might change over a three-year period. So I want to retain the option of doing one or the other. And the government says, in effect, okay, if you want to decide in a few months or half a year, rather than decide for the whole time, we'll give you this interim situation. You give us—the taxpayer will give the government the money, and if I win, I get it back without interest. And if you win, I don't have to pay interest, but I can change this situation at any time. Then when I change it, I can revert back into the two options that I have. What is inconsistent with the time value of money or with an ordinary way of running government to have that kind of an option? Now, you could say the option is not authorized. I understand that. I take that to be your position. But if it is authorized, I don't see what's incoherent or flawed or problematic about having such an interim way of determining what the longer-term interim resolution will be. Are you with me? I think so, Your Honor. And let me try to answer that by explaining how we understand the provisions to work and to be consistent with the time value of money principle. First, I think both the underpayment and overpayment provisions operate off the date of payment, and I think this Court largely acknowledged that. Now you're arguing, I understand the merits. I'm trying to get at why this would be an unlikely system. I'm not trying to ask you what this is. I know what your position is, I think. I've read your briefs. To figure out why this position, if you state the government's position this way, it seems to be consistent with the time value of money because the taxpayer has these three choices. The taxpayer can say, I opt to pay now, payment, pay, really pay, in which case I can't get it back until it's finally resolved. And if I'm successful, I'll get interest. That's the payment. But the taxpayer has a third option, which is, wait a little bit before I decide between these two options. And while I'm waiting, I agree that if I decide to go the not pay option, I won't get the interest on that. But what I preserve by giving up that possibility is the possibility of changing what my overall interim decision will be. So it's kind of like a, here's something we're going to call a bond, the government says, and that bond is just a way of postponing the interim choice that the taxpayer has. And it's not as good as one choice, and it's not as good as the other choice. In each way, there's a way in which it's not as good. What's wrong with that? What's wrong with that, Your Honor, is it doesn't take into account the time value of money principle Well, he's giving up the time value of money concededly in return for the power to change his mind during the interim. And the reason, but the funds here were actually used to pay the taxes. And the reason why that construction That's a, pardon me, but that's a conclusion that sort of assumes the answer. What I'm asking is why can't you have a system where the taxpayer can go one way consistent with the time value of money, can go the other way consistent with the time value of money, or can say I'm going to give up a little bit on the time value of money in order to retain the option of going one way or the other. So the reason why you can't, Your Honor, is because of what Congress has done. All right. So there's nothing unusual or contrary to the system of how people deal with money to have that. It's just Congress didn't allow it. Well, I mean, I think I might quarrel with whether that would be the better rule or usual or would in fact implement. But it wouldn't be a scheme that's just sort of illogical. It might not be the best scheme, but it could be a scheme. Once you get to that, then if you assume that, then the answer is does the statutory scheme preclude that possibility? And you're saying yes, it does. But I thought the force of your argument originally, I must say, was that it's strange that the government would ever, or the government read large, Congress and the agency that's carrying out Congress's wishes through regulations and all the things they do, it would be strange to have such a system. But I'm wondering now whether it's just not a very strange system. It just seems like a logical system. And then the question is, well, is it the system or not? But the question of whether it is the system or not is colored pretty strongly by whether it's a strange system or not. Am I making sense? I take your point, Your Honor. But I think the reason why that doesn't work here is we know that under the system that the IRS implemented, it treats the date of deposit as the date of payment for purposes of the underpayment interest provisions. And we know that the IRS couldn't do that unless that's the correct interpretation of the statute because Congress in 6404E doesn't allow the IRS to abate interest unless it's actually proper. To me, that's a way of saying Congress could not offer this interim choice. It just doesn't have the power. I mean, the agency doesn't have the power because Congress didn't give them language to do it. In fact, when they've offered this thing, which is to the benefit, the way I've described it, totally to the benefit of the taxpayer because the taxpayer can pay the advance payment. The taxpayer can not pay the advance payment. This gives the taxpayer a middle choice of postponing the decision a little bit. So that's a gratuity given to the taxpayer, which you're saying isn't supported by the statutory scheme. It's not supported by the statutory scheme. And the real gratuity here goes to the government, which takes the deposits and puts them immediately into the U.S. Treasury and gets the full-time value money of that deposit. But that would have been the same if there had been an advance payment, which was an option for all along. It would have been the same. But under our view, the right way to think of the system as implemented is between deposits that are actually used to pay taxes and deposits that are returned. And the last point I would make is. . . Before you do that, Judge Gibbons would like to ask a question, which I hope is a short one. I want to sort of refocus you and ask a question that really goes to kind of time frame as a potential aid to interpretation of the statute. At the time 6611 was enacted, this notion of a cash bond deposit was not in play, correct? You know, I think that's correct. Although that notion goes all the way back to the older cases in Rosamond. But what I'm trying to find out is whether you agree with the point that this cash bond deposit is really a creation of the IRS, not a creation of statute. And its use really postdates enactment of the statute. I think I would agree with that. Yeah, okay. So does that mean even if you're not applying a rule of strict construction, that it makes sense to view the statute in the way that would be most commonly understood given the time frame in which we're evaluating it, i.e., the time of passage? No, it wouldn't, Your Honor. Here's the reason. If you go all the way back to cases like Rosamond, at that time the taxpayers would actually put funds into a suspense account. That's what it was called. And then the courts said that they weren't going to treat that as a payment because at the time . . . So a similar procedure, just handled a bit differently. Right. And what's changed is that postdating that under the regime that now exists, the cash deposits actually go directly into the U.S. Treasury. And so that's a difference that makes this much more like a payment. Now, the government has argued that it can't be a payment because there's no liability that exists when the deposit is made. Congress addressed that specific argument and basically negated it in 6401 by saying that the fact that there isn't a liability on the books when the deposit is made doesn't mean it's not a payment. And so Congress . . . Doesn't that postdate 6611? I don't think it does, Your Honor. I may be wrong on that, but I don't think it does. You know when it dates from? 6611? 6401. 6401 does postdate 6611. No, that's right because . . . That's what I thought. Congress passed it to clarify that the fact that deposits were made before there was not a tax liability wasn't a basis for not treating them as a payment. I think I have concluded my line of questions. Okay. Your adversary is going to say, hey, wait, he got a whole lot more time than I did. So I think we'll proceed to the other side at this point. Okay. Thank you, Your Honor. May it please the Court. I'm Arthur Catterall, the Justice Department, on behalf of the United States. Starting with Scripps. In the Scripps case, a panel of this Court held that 28 U.S.C. 1346 grants jurisdiction to district courts to hear suits against the United States, like this one, for the recovery of interest on overpayments of tax that have already been refunded in full by the IRS. Specifically, the panel held that such a stand-alone overpayment interest suit is a suit for, quote, the recovery of any sum alleged to have been excessive within the meaning of 1346A1. We respectfully submit that the full Court should reconsider that holding. In order for Section 13- Didn't the full Court already say they didn't want to do that, though? I'm sorry? Didn't the en banc Court say they didn't want to do that already once? Are you talking about in Scripps? Yeah. There was no petition for rehearing request. But the argument was made before, but prior to the time, this Court, in this case, had an opportunity to consider the case en banc or not, right? Scripps predated this case. I understand that. I'm sorry. I didn't understand your- The Court has had at least one opportunity to decide, whether it was in Scripps or this case, whether it wanted to take up the issue of 1346, the correctness of Scripps, correct? Whether it was in Scripps or in this case. Well, again, we didn't raise the jurisdictional argument until we got to the Supreme Court. Well, you didn't raise your jurisdictional argument, but Ford raised its new jurisdictional argument prior to action on the petition for rehearing en banc, if I'm not mistaken. You didn't raise the 1429 or whatever it is, 1491 argument, but they raised the 1346 argument, didn't they? Right. They argued that 1346 rather than 6611, or that 1346 is the only applicable way. In the Court, the Court's refusal to grant en banc review must be taken for something, whatever it means. I don't think the Court was presented with the issue of whether it's 1346 or 1491. I think the Court was presented with the issue of whether 1346 is the only relevant provision here regarding waiver of immunity. Your opposing counsel, I thought, helpfully divided this up into three issues. We're on the first issue now, am I right? Correct. On the first issue, you would agree that as a panel, we're bound by Scripps, or that Scripps is somehow distinguishable? Absolutely not. You are bound by Scripps. So you're right now suggesting that we suggest to the full Court, okay, I think we got the idea that you would like us to ask the full Court to do this. But that's sort of a secondary request, I don't know. Unless my colleagues disagree, maybe you could go on to the other. Well, I mean, if it'd be- I mean, it's controlled. We're controlled by it, really. We can't- For the Oak and Yew. This is true. And those arguments will go where they go. Okay, but I'm happy to elaborate a little bit as to why we think that Scripps should be reconsidered. Okay. And that is that in order for 1346 to provide the necessary waiver of immunity to suit in this case, it must do so unambiguously. And that's without regard to the no-interest rule of Shaw. That's just ordinary sovereign immunity principles. It has to be unambiguous. And it's difficult to see how the phrase, any sum alleged to have been excessive, constitutes an unambiguous reference to overpayment interest. I mean, obviously, when one seeks additional overpayment interest from the government, you're not alleging that such interest was excessive. You're alleging that it was insufficient. And the Scripps panel reasoned that a claim that the government paid insufficient overpayment interest is simply the negative formulation of a claim that the government retained an excessive sum. Whatever the merits of that reading of the term excessive sum, it can't be said that that's the only permissible reading of the statute. And by definition, then, the term excessive sum does not unambiguously encompass suits, stand-alone overpayment interest suits like this one. So that's the point, the first point. And another point, and as this panel recognized in its earlier opinion in this case, the Scripps panel relied in no small part on the Supreme Court's statement in the 1960 case of Flora v. United States, that an example of any sum as used in Section 1346A1 would be interest. And we demonstrated in our supplemental brief that the Flora court was referring to underpayment interest, interest paid to the government, which a claimant under Section 1346 will obviously allege was excessive. And all you have to do is look at the very next sentence of that opinion where the court says, quote, and it is significant that many old tax statutes describe the amount which was to be assessed under certain circumstances as a sum to be added to the tax. That's a reference to underpayment interest, not overpayment interest. So we don't think that Flora supports the exercise of jurisdiction here. Moving on to the second point, well, and also just to make a quick point, that in the event that the court were to reconsider Scripps en banc, and in fact overrule Scripps, Ford would not be left without a remedy because there's this provision. Does this on this point mean that you think that the merits of your position are weak when you don't have the strict construction argument to help? No, we are following the Supreme Court's direction to flesh out this jurisdictional argument. Yeah, we realize we're giving up a win if the court agrees with us. But this is what we argued in Scripps. We've continued to believe that Scripps was wrongly decided, and so now that the Supreme Court has put it front and center, we're making the argument again. But at any rate, there's this remedy under 28 U.S.C. 1631 where the case could be transferred to the Court of Federal Claims, and so Ford would not be left without a remedy. Now, regardless whether the necessary waiver of immunity to suit in cases like this is found exclusively in the Tucker Act or is found also in Section 1346A1, IRC Section 6611 must be construed narrowly as a separate waiver of the government's immunity from an award of interest, as this panel correctly held in the prior opinion. And that much is clear from the Shaw case where the court held that, quote, in the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award. Was this argued before the panel the last time around by you, this strict construction under the? Yes, yeah, certainly, yes. The whole Shaw argument, yes. And the court further stated that such consent to an award of interest must be strictly construed. And then the first example of a waiver of sovereign immunity with respect to interest that the court cited was 28 U.S.C. 2411, which is the analog of Section 6611 when you're in the context of a judgment, a refund by court judgment. So. Well, let's say that we, let's say we, you know, we're going to follow scripts. And that would mean that 1346 is in and of itself establishes the jurisdiction. So we don't need to look at 6611 as an additional statute conferring jurisdiction. So why would we be then, what would be the point in our deciding to characterize 6611 as a further waiver of sovereign immunity other than just to get you a canon of construction that you'd like to have? But analytically, why would we ever want to, I mean, we're done with jurisdiction. Right. Why would we want to discuss it further? We're not saying that 6611 is a waiver of immunity to suit. It's the separate waiver of an immunity to an award of interest that the Shaw court referred to. Does that make a difference in terms of whether you're entitled to strict construction? Yes. Well, the scripts didn't seem to think there was anything. I mean, I understand, I understand the distinction between the immunity of suit and the need to have an avenue for relief. But I'm just not sure. Scripts doesn't seem to have thought anything was incomplete once you left 1346 as establishing jurisdiction in spite of Shaw. Right. So wouldn't we have to sort of part in some way from scripts to embrace your analytical framework for the case as you're now articulating it? Well, there was no issue in scripts as to whether section 6611 must be narrowly construed. The only issue in scripts on this issue was whether 1346 provided the necessary waiver of immunity to suit in cases like this. 6611. Immunity from suit. Scripts was also talking about whether or not interest specifically could be recovered in 1346 as a vehicle for finding jurisdiction for that. Wasn't it? I mean, wasn't that the whole point of the opinion in scripts? Yes, sums includes interest and that provides you the vehicle for seeking to recover your interest. Right, right. But the question is, does the scope of the government's waiver of immunity to an award of interest in 6611, there's no question that the government has waived immunity to interest in section 6611. That just spells it out. The statute says you get interest. The question is, does the scope of that waiver have to be construed strictly? And we maintain that it does under the plain language of the Shaw case. It acknowledges that it's a separate waiver from the general waiver of immunity to suit. And it says, nonetheless, it has to be strictly construed. It says it's an added gloss of strictness on the normal rules of sovereign immunity. The Shaw court was looking at Title VII's attorney's fees provision and finding significant its failure to mention interest, right? Correct. Which doesn't seem to me too analogous to where we find ourselves in this case. Right, right. Given the way Scripps interpreted Shaw. Right. I mean, the issue in Shaw was whether there was a waiver of immunity to an award of interest. Here, the issue, there's not an issue. Obviously, there's been a waiver of immunity from an award of interest. The issue is, does the scope of that waiver, must that be construed strictly? Well, it's like you admit that if 6611 has jurisdictional significance, it's in the favor of permitting a suit for interest, not in favor of not permitting it. We're not saying 6611 has jurisdictional significance. I thought you told me it did. Maybe we're Scripps passing aside on this point. The waiver of immunity to suit is, we maintain, is 1491. The Scripps court thought also that 1346 was a waiver of immunity to suit. 6611, again, is not a jurisdictional provision. But we maintain that the court in Shaw clearly stated that when you've got one of these waivers of immunity from interest that's separate from the general waiver of immunity to suit, you still have to construe it narrowly. It seems to— I think, really, the difference we're having may be about the scope of Scripps. But be that as it may, go ahead with whatever you want to say. Okay. And just a point about— Could you address the merits, please? Okay. No, go ahead. Could you address the merits? Sure. Just apart from the presumptions, just— I take it your position is somewhat close to what I was describing when I was asking questions of your opponent, which is that this deposit animal is a little bit different from an advance payment and has sort of special qualities, but it's an option. If that's close to your position, what's the statutory basis for such an animal? Well, that's a good question because— And I think—I don't think you will find, you know, prior to Section 660— You agree it exists, the animal. There is this. Oh, absolutely. It happens, and it's been out there, and something like that has been going for a while. And it's been out there since— And where did it come from is my question. Did somebody just make it up over in the Treasury Department? It started as administrative practice, and I think we pulled up— We who? I'm sorry. When we were briefing the case, the government, we pulled up administrative rulings back to the 30s talking about this procedure. Now, that does post-date the enactment of 6611, which was, I believe, 1921, but it goes back a long, long way. And I think you'd be hard-pressed to find explicit authority in the code for this animal. What if we decide all these years later that there was no authority for it? I'm sorry? What if we decide all these years later that there was no authority for it? How does that affect this case? If there is no authority for— Yeah, that they were just giving something out to taxpayers they didn't have any right to give. I'm not saying that's true. I'm just wondering how strong this procedure is. Well, it's something that, again, was first recognized by the Supreme Court in 1945. It sort of acknowledged. I mean, they didn't bless it. They just said, we know it's there. Right. Right. And, you know, in the ensuing decades, the IRS put out revenue procedure after revenue procedure, you know, updating this— And all that time you would say it was assumed that no payment would be made on those, even assuming the taxpayer turned out to be correct. Right. Is that right? Is it clear from all of those sources that you looked at that that's an aspect of it? I mean, if you look at the legislative history to Section 6603, which was enacted, I believe, in 2005, you know, all the committees clearly state a deposit in the nature of a— You know who's going to jump on us if we start relying on that kind of stuff. We all know that. Well, I guess— Stuff we can look at. I mean, and please, all the justices on the Supreme Court, not just some of them. I mean, I think the point to be made is that while you might be hard-pressed to find explicit authority in the code for this animal, I think you'd also be hard-pressed to find that the code prohibits this kind of animal. But what would we find about the practice of paying over payment interest on those deposits? It would be nil? Or there would be affirmative statements? It would be absolutely nil. And is there contrary evidence of the practice of not paying over payment interest on those things? No. No. So we just don't know? Or there's never been over payments during all those years? Well, I think there are. I mean, the issue is so well settled that I don't think it's been addressed in a long time. Well settled in the sense that you just haven't paid it? Well settled in the sense that a deposit is not a payment that— I'm trying to get away from the definitions and look at the practice. I'm sure that various documents say various things about the words. But the practice is when the taxpayer makes one of those things and then prevails later, no over payment interest is paid. Not until the deposit is— No, that's what I'm talking about. Right. Not until the deposit is applied. But when it is, the amounts prior to that changeover, prior to the application as a tax, have never been paid, you're saying? That's correct. That's correct. But despite that consistent practice, you don't have too much evidence that that's the practice. Is that what you're saying? You're just telling me you know what your department does, but it would be easier if we had something to cite. Again, the practice was so established that there just aren't a lot of challenges to this practice. I guess what I'm trying to get at is when Ford did this, if they knew that by making this option rather than the other option meant that if they ultimately win, they weren't going to get interest, it takes a lot away from the equities of the case. If they thought giving this was as likely as not—well, how were they to know if all of this practice was unavailable? Are you with me? Do you see what I'm asking? I would think that a large taxpayer like Ford has dealt with this procedure year in and year out and knows how it works. But I'm asking, is there any evidence that we could—usually when you say we assume a lawyer knows something, we assume a lawyer knows something because there's a place she can find it. I think there was, and I can't remember who it was, somebody from one of the— Supreme Court dictum. Right. No, somebody from one of the big four accounting firms came up with this idea. What difference does it make in the analysis if Ford was well aware of how this works? I mean, I haven't been able— Well, that's just my question. Well, I know, but where would you—in the absence of Judge Rogers' question, where would you put it? Since it's clear Congress wasn't thinking of this at the time it enacted 6611. Correct. I mean, it sounds to me like in all likelihood Ford was aware of the differential treatment because Ford is a sophisticated taxpayer and because this dispute emerged out of a longstanding procedure. But what does that have to do with the interpretation of the statute is what I'm asking you. Yeah, I don't think that it has a lot to do with— I think Judge Rogers was just saying it sort of takes away from the equity of their— to the extent there's any equity in their position. It destroys it. But in terms of how that affects the interpretation of the statute, I don't think that it has all that much to do with how the statute is— It fits within the analysis only to the extent plucking some equity out of the air might be appropriate. I didn't mean to suggest Judge Rogers was plucking equity from the air. I thought of the way I took it. I spent a lot of time thinking about this too. In any event, and the revenue procedure that was applicable at the time obviously is not a model of clarity. But I think it's important to note that Ford's argument here is not limited to this relatively new practice where the IRS allows people to convert deposits into payments just on demand. Ford is arguing that whenever a remittance that was initially designated as a deposit is applied to satisfy a tax liability, regardless whether that remittance was converted into a payment at some point in the interim, that remittance attains retroactive payment status all the way back to the date of remittance. And, I mean, that's— Again, they're not just limiting this to this special case of where the taxpayer requests a conversion. So this is a pretty sweeping argument. And the only argument in support of that theory that Ford raises in their reply supplemental brief is, quote, that is the only way to understand how the IRS treats underpayment interest. And I would suggest that in all the years of judicial and congressional commentary on this system, on deposits and the nature of a cash bond, no court or congressional committee has ever suggested that deposits stop the running of underpayment interest from the date of remittance by virtue of some retroactive change in status when they are ultimately applied to satisfy a tax liability. Now, I think the universal understanding is that the IRS may allow taxpayers to stop the running of underpayment interest by means of a remittance that is not a payment of tax, period, neither initially nor retroactively. So—and then also on this point about Ford's—the theory that Ford advocates, and that is that when the IRS applies a deposit to satisfy a tax liability, the deposit retroactively becomes a payment all the way back to the date of remittance, is precluded by the revenue procedure—that's at issue here, Revenue Procedure 8458. There's Section 4.02, Paragraph 2. And that provision clearly states that a deposit that is applied against a later assessment is applied as a payment of tax as of the date the assessment was made. Not retroactively back to the date of remittance. And that's entirely consistent with this troublesome second sentence of Section 505 of the Revenue Procedure, which provides that where remittance that was initially treated as a deposit is subsequently converted to a payment of tax prior to assessment, pursuant to Section 4.023, which was the only provision in the Revenue Procedure that contemplated such a pre-assessment conversion, the remittance will bear overpayment interest, i.e., will be treated as a payment of tax from the date of conversion. And deposits like Ford's that are subsequently converted into payments of tax prior to assessment under circumstances not described in the Revenue Procedure should likewise bear overpayment interest from the conversion date, not the earlier remittance date, just like deposits that are converted into payments of tax by virtue of having been applied to satisfy and assess tax liability. The interest runs from the date of conversion. I think we've evened this out. Okay. And we now have a few minutes of rebuttal. Thank you, Your Honors. A few points. First, on past practice, we disagree with the IRS's characterization. In this case, the IRS initially treated the deposits as payments for purposes of the overpayment interest provisions, and the record cites to that is on page 7 of our initial reply brief. Secondly, Ford, when it made these deposits, specifically and explicitly relied on the IRS's own Revenue Procedure, 8458, the only published guidance on this, and as this Court recognized and as this District Court recognized But it relied on a negative inference? Well, it relied on its reading, and we think the proper reading of that is that it supports Ford's position. This Court called the IRS's position strained. We recognize you didn't reach a merits judgment on that, but this Court and the District Court has recognized that the IRS has not offered a coherent interpretation of its own Revenue Procedure. We specifically relied on that. And third, in discovering this case, You relied on it. You relied on something that required an inference. I mean, it didn't say you'll get this. Well, what it says In some other situation, you would not get it, and therefore you assumed that by negative inference you would get it because you weren't within this exception. Is that right? What it explicitly says, Your Honor, is that for purposes of underpayment provisions, the deposit will be treated as a data payment regardless of whether it's designated as a cash bond or something else. The Revenue Procedure explicitly says that. And then in 5.01, it explicitly says deposits that are treated as We knew that. I mean, that's part of the I don't know. If you buy that sort of assumption of what the nature of this animal is, it is something that will stop underpayment interest. But the only way it can do that, Your Honor, is if the deposit is a payment. That's the only way to understand the statutory scheme. I understand that, but that's the legal argument. I thought you were addressing the how much notice they had argument. Well, and I think that that Revenue Procedure 8458 is perfectly consistent with Ford's interpretation. We also asked for discovery on the IRS's prior practices here, and the IRS refused to give it to us. Second, in terms of the statutory scheme How did they do that? How did we do that? Did you ask the court for that, and the court turned it down? No. We asked for discovery on the IRS's past practices. The IRS refused to give it and said it was irrelevant to this. So for the IRS then to come here and argue that you Did you challenge that in court? We did not challenge that. We've made clear our interpretation of the past practice here. With respect to the statutory scheme, I think the pole star for the interpretation has to be the longstanding and undisputed position that the date of payment for purposes of the underpayment provisions is the date of the deposit. And once you establish that, I think these provisions are functionally parallel, and the date of payment for purposes of the overpayment provision has to be the same. The same remittance can't have a different date of payment based on whether or not it turns out that there's an overpayment or underpayment of tax. And for purposes of worries about what this court's decision would do with respect to prior history, if the court concluded that the date of payment for purposes of the underpayment provisions was not the date of deposit, then it would cast doubt on the longstanding practice of treating the deposit as the date of payment for purposes of the underpayment provision and suggest that the IRS for decades has been defeasing interest with no statutory authority to do so. And again, that comes from 6404E. Third, the IRS's current position really makes an absurdity of the current statutory scheme. As we've noted, after the events at issue in this case, IRS amended these provisions to add 6603, which now provides that the taxpayer actually gets interest on a return deposit. So under the IRS's understanding of the statutory scheme, Congress would have granted the taxpayer interest on the return deposit, which is fully consistent with the time-value-of-money principle, but Congress wouldn't have intended for the taxpayer to get the full-time value of its payment when the taxpayer makes the deposit and those funds are actually used to pay the taxes at issue, which is exactly what happened in this case. That makes no sense whatsoever. The only way to understand 6603 is that Congress had the same understanding of the past practice that the taxpayer does here, which is that the deposits, the date of deposit is the date of payment for purposes of both the underpayment provision and the overpayment provision. That's consistent with the statutory scheme. It's consistent with the IRS's own revenue procedure. And the last thing I would say is about the equities in this case. Ford received a 30-day notice saying that it underpaid its taxes by a substantial amount. At that point, it had little choice but to give the IRS in the form of these deposits over $800 million in order to... It could have given them an advance payment. Well, Your Honor, it could have. But what it did was it gave the IRS this money and the IRS immediately put that money into the U.S. Treasury. They gave it subject to immediately taking it back, right? Well, they could have, Your Honor, but the point is they didn't. And that's relevant... But then under this possible scheme that may exist, whether it's justified or not, when they gave it, they had the choice to make sure that they got... They got overpayment interest if it turned out to be an overpayment. They didn't select that one. With respect, Your Honor, I think that is irrelevant to the application of the time-value money of principle that this Court emphasized in the Scripps decision. The fact is the IRS got the money, it put it in the U.S. Treasury, it got the full benefit of that money, it determined that... Almost full benefit. I mean, you can't really use money that people can take at any time. You absolutely can, Your Honor. You put it in the U.S. Treasury and it counts as funds belonging to the United States just like anything else. The IRS could have earned its own interest on that. It could have used those funds against other funds for purposes of debt purposes. It absolutely got the full value of those funds. And that's why once it's determined that the taxpayer, in fact, did overpay its taxes, then under Scripps, under 6611... You usually get, just as an economic matter, I hate to quibble, don't you usually get higher interest when you loan something for a longer term? You loan something with the right to retrieve it at any time, that's like a bank deposit. Usually that's lower interest than if you buy a two-year CD or something like that. I don't think it's right. I would disagree with the notion that this deposit was a loan. It's right that Ford could have asked for it back, but what's relevant is that... At any time they could ask for it back. Until they convert it. Until they convert it. But what's relevant is that the IRS had these funds, it used them, it put them in the U.S. Treasury. Is that in the record? That the IRS had the funds? No, that the IRS put it in the U.S. Treasury. Your Honor, we stated it several in both our opening brief and in our reply brief. That doesn't make it evidence, does it? No, it doesn't, Your Honor, but the IRS never contested it. I understand that. And that's consistent with the practice. That's what they do. They put it in the U.S. Treasury. And so then if the question is under 6611, what does the taxpayer get back? As the Court said in scripts, the purpose of 6611 is to disgorge the interest that the IRS had as a result of the overpayment and make sure that the taxpayer gets that back. And so here what 6611 does is it entitles the taxpayer to the interest on the funds that were used to pay the taxes and to disgorge the IRS of the time value of money benefit that it wrongfully obtained. And that's what Ford is asking for here, to allow the government to prevail on the merits, would unquestionably allow the government to have the benefit of a windfall, the benefit of the value of Ford's money on overpayments that it was not entitled to. And for that reason, we would ask this Court to rule for the taxpayer on the merits, to find that there is jurisdiction under 1346, and to find that the strict construction rule is limited to 1346 and does not apply to 6611. Thank you, Counsel. The case will be submitted. You may adjourn the Court.